AO 91 (Rev. 11/11) Criminal Complaint

AUSA Matthew S. Ebert (312) 353-5354

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

FEB 20 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

LAWRENCE L. JACKSON,
also known as "Tank"

CASE NUMBER:

UNDER SEAL 18CR 111

MAGISTRATE JUDGE FINNEGAN

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. From on or about February 16, 2018, through at least on or about February 17, 2018, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 2261A(2)(A) | With the intent to kill, injure, harass, intimidate, used an interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate commerce, namely, cellular telephone networks and text messages, to engage in a course of conduct that placed Victim A in reasonable fear of death or serious bodily injury, or caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to Victim A. |

**FILED**

FEB 20 2018

MAGISTRATE JUDGE
SHEILA M. FINNEGAN

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

_Sasha Douyon_

SASHA DOUYON
Inspector, United States Postal Inspection Service

Sworn to before me and signed in my presence.

Date: February 20, 2018

_Sheila Finnegan_
_Judge's signature_

City and state: Chicago, Illinois

SHEILA FINNEGAN, U.S. Magistrate Judge
_Printed name and Title_

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS      ss

## AFFIDAVIT

I, SASHA DOUYAN, being duly sworn, state as follows:

1.      I am a Postal Inspector with the United States Postal Inspection Service (USPIS), and have been so employed for four years.  My current responsibilities include the investigation of crimes involving the United States Postal Service, which includes investigating work place violence and threats against United States Postal Service employees.

2.      This affidavit is submitted in support of a criminal complaint alleging that LAWRENCE L. JACKSON a/k/a "Tank," has violated Title 18, United States Code, Section 2261A(2)(A).  Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging JACKSON with cyberstalking, in violation of Title 18, United States Code, Section 2261A(2)(A), I have not included each and every fact known to me or others concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.      This affidavit is based on my personal knowledge, information provided to me by other individuals and other law enforcement officers, and my review of reports and electronic communications—namely, text messages.

4.      Beginning on or about February 16, 2018, through at least on or about February 17, 2018, JACKSON has used an interactive computer service, electronic communication service, electronic communication system of interstate commerce, and other facilities of interstate commerce, namely, cellular telephone networks and text messages, to engage in a course of conduct that placed Victim A in reasonable fear of death or serious bodily injury, including, as discussed below, entering into Victim A's home (including into Victim A's bedroom) after midnight while Victim A was elsewhere and, from within Victim A's own home, threatening Victim A with a series of texts messages that stated, among other things, "I'll be here w[h]en you get here;" "I'm gonna fuck you up"; "Bitch I'm going to kill you I'm telling you now;" and "bring him with you please I got something for the both of yall just come home."

## I.      CYBERSTALKING STATUTORY DEFINTIONS

5.      Stalking is covered in the United States Code under the Domestic Violence and Stalking chapter of Title 18 effective October 1, 2013, as part of the Violence Against Women Reauthorization Act of 2013, Pub. L. 113–4, title I, § 107(b), Mar. 7, 2013, 127 Stat. 77.  More specifically, 18 U.S.C. § 2261A(2) covers what is commonly referred to as "cyberstalking," and makes it a federal crime when one:

- with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person;

- uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce;

- to engage in a course of conduct that places that a person in reasonable fear of the death of or serious bodily injury or auses, attempts to cause,

or would be reasonably expected to cause substantial emotional distress to such person person, 18 U.S.C. § 2261A(2)(A) and (B).

6. Title 18, United States Code, Section 2266(2) defines the required "course of conduct," as that term is used in 18 U.S.C. § 2261A(2), as "a pattern of conduct composed of two or more acts, evidencing a continuity of purpose."

7. The Wiretap Act defines the term "electronic communication," as that term is used in 18 U.S.C. § 2261A(2), as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12). The term "electronic communication service," as that term is used in 18 U.S.C. § 2261A(2), is defined in the Wiretap Act at 18 U.S.C. § 2510(15) as "any service which provides to users thereof the ability to send or receive wire or electronic communications." An "electronic communications system of interstate commerce" is defined under 18 U.S.C. § 2510(14) as "any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications."[1]

---

[1] I know from my training and experience, as well as from publicly available information, that text messages are a form of electronic communication offered by cellular service providers, such as T-Mobile, which as discussed below, is a cellular service provider involved in the transmission and receipt of certain text messages between JACKSON and Victim A on or about February 16 and 17, 2018. More specifically, I know from such sources as https://www.t-mobile.com/company/company-info/overview/, that T-Mobile US, Inc., ("T-Mobile") is headquartered in Bellevue, Washington. T-Mobile provides an electronic

## II.   JACKSON'S USE OF TEXT MESSAGES TO THREATEN AND CYBERSTALK VICTIM A

8.    According to information that Victim A provided to law enforcement officers on February 17, 2018, Victim A is employed as a United States Postal carrier at the Post Office located at 123 Indianwood Boulevard in Park Forest, Illinois. Victim A said that she had been in a relationship with JACKSON, whom Victim A called "Tank." According to Victim A, JACKSON is married but JACKSON has also been Victim A's boyfriend.

9.    Victim A told officers that approximately two weeks ago, on or about February 4, 2018—which was Super Bowl Sunday—Victim A was in her home in University Park, Illinois, along with Individual A. On that day, according to Victim A, JACKSON came unexpectedly to Victim A's home and kicked in Victim A's door. Victim A told officers that JACKSON hit Victim A on her left eye and then JACKSON pulled out a gun on both Victim A and Individual A.

10.    As discussed below, JACKSON was interviewed by law enforcement officers on February 17, 2018, after JACKSON was arrested and *Miranndized*.[2]

---

communication system of interstate commerce and an electronic communication service because, among other things, T-Mobile "is a nationwide provider of wireless voice, messaging, and data services capable of reaching over 308 million Americans where they live," and it provides such "wireless voice, messaging, and data services" to approximately 69.6 million customers via T-Mobile's "nationwide 4G LTE network." *See* https://www.t-mobile.com/company/company-info/overview/.

[2]    Park Forest Police officers arrested JACKSON on February 17, 2018, and held JACKSON in custody at the Park Forest Police Department. Before JACKSON answered any questions, officers *Mirandized* JACKSON. JACKSON signed a written *Miranda* waiver at approximately 10:21 a.m., on February 17, 2018. JACKSON then voluntarily provided a statement to officers, which the officers typed. Within the typed statement, JACKSON acknowledged, "I have read this statement consisting of

According to a post-*Miranda* written statement that JACKSON provided to the Park Forest Police Department on February 17, 2018, JACKSON stated, in part, that

> . . . approximately 2 weeks earlier [JACKSON] went to [Victim A's] house in University Park and kicked open her door, but after [Victim A] told [JACKSON] that a stalker named "Shades" had intruded into her home. During this time, [JACKSON] observed [Victim A] in the residence with another man [Individual A], whom [Victim A] invited inside. After [JACKSON] discovered this[,] [JACKSON] threatened to "bust [Victim A's] face in with [JACKSON's] gun" while flashing the gun at [Victim A].

However, JACKSON further stated in February 17, 2018 statement to Park Forest Police officers, that, although JACKSON flashed the gun at Victim A, JACKSON claimed he "never pulled out the firearm, pointed it at [Victim A] or touched her with it" during the February 4, 2018 incident at Victim A's home.

11.     In addition, on February 17, 2018, JACKSON was *Mirandized* by U.S. Postal inspectors (including your affiant). In reference to the February 4, 2018 incident at Victim A's home, JACKSON told inspectors that JACKSON came over to "check on her and this guy [Individual A] was there.[3] We had words and I slapped

---

3 pages, and I affirm to the truth and accuracy of the facts contained therein." JACKSON signed his name on the statement, and added a handwritten addition at the end (also followed by JACKSON's signature), which reads: "I have been treated good by the Park Forest Police Department, as they have provided me with water and food to eat. I have been given the opportunity to review this statement and make any changes. I affirm that the information contained within this statement is true and accurate information provided by me."

[3]     Postal inspectors read JACKSON his *Miranda* rights while JACKSON was in custody at the Park Forest Police Department following JACKSON's arrest on February 17, 2018. JACKSON waived his *Miranda* rights in writing to Postal inspectors at approximately 11:16 a.m., on February 17, 2017, and then JACKSON voluntarily provided statements in response to the Postal inspectors' questions beginning at approximately 11:17 a.m. that day.

[Victim A] with an open hand." JACKSON also said that JACKSON pulled his gun off with the holster, too, and told Victim A, "I should hit you with the butt of this gun." JACKSON further told inspectors that the incident on Super Bowl Sunday was "physical" and that JACKSON "did strike [Victim A]." Similarly, on February 17, 2017, when JACKSON told Park Forest Police officers about this previous Super Bowl Sunday incident, JACKSON said that he "threatened to 'bust [Victim A's] face in with [JACKSON's] gun.'"

12.    Victim A told police officers on February 17, 2018, that JACKSON is becoming unstable.

13.    JACKSON told Postal inspectors on February 17, 2018, in apparent reference to JACKSON's conduct toward Victim A, that, "This started getting out of hand since the last month." JACKSON said he is married but has "been in love with [Victim A] for a long time."

14.    Victim A told police officers on February 17, 2018, that Victim A began to receive phone calls from JACKSON starting at approximately 9:30 p.m., on February 16, 2018. In these nighttime phone calls on February 16, 2018, JACKSON told Victim A, among other things, that JACKSON was coming over to Victim A's house. Victim A has a pink Apple cell phone, which I have observed, with T-Mobile as Victim A's cellular network provider. According to Victim A, Victim A had previously entered JACKSON's nickname, "Tank," into Victim A's cell phone contacts list on Victim's cell phone. As a result, when Victim A received a phone call or text message on her cell phone from JACKSON, then such communications appeared as

coming from "Tank." Victim A told police officers that JACKSON has two phone numbers, (312) 536-XX78 and (414) 397-XX49, both of which Victim A had previously entered in her cell phone contacts list under JACKSON. According to Victim A, JACKSON has a personal Apple cell phone associated with JACKSON's phone number (312) 536-XX78, and JACKSON has an Android work cell phone associated with JACKSON's phone number (414) 397-XX49. According to Victim A, JACKSON has Verizon Wireless and T-Mobile cellular services.

15.     According to Victim A, Victim A left her home at night on February 16, 2018, after JACKSON had called to notify Victim A that JACKSON intended to go to Victim A's home.

16.     Victim A told police officers that, after JACKSON's phone calls that began at approximately 9:30 p.m., on February 16, 2018, JACKSON then engaged in a series of text messages to Victim A throughout the night, including during the early morning hours of February 17, 2018. I have reviewed those text messages on Victim A's Apple cell phone, which show multiple text messages to Victim A from JACKSON's contacts name, "Tank."[4] Specifically, JACKSON sent a text message to

---

[4]   On the morning of February 17, 2018, when Postal inspectors met with Victim A, Postal inspectors reviewed some of the text messages between JACKSON and Victim A. Postal inspectors took a series of photographs that show JACKSON's text messages from February 16-17, 2018. In total, Postal inspectors took approximately 19 photographs of the text messages on Victim A's cell phone. Some of those photographs of JACKSON's text messages are contained within the affidavit. The 19 photographs bear time stamps on Victim A's cell phone ranging between 10:20 a.m. and 10:22 a.m., which correspond to the time frame when Postal inspectors reviewed and photographed the text messages on February 17, 2018 (rather than the actual time frame when JACKSON sent the text messages).

Victim A at approximately 9:06 p.m., on February 16, 2017. Thereafter, beginning at approximately 12:28 a.m., on February 17, 2018, JACKSON texted Victim A a series of messages, some of which contained photographs that JACKSON took from within Victim A's home when Victim A had fled elsewhere. According to Victim A, Victim A's adult son allowed JACKSON into Victim A's home in the early morning hours of February 17, 2018. Below are some of the photographs JACKSON texted to Victim A on February 17, 2018, which include photographs taken from within Victim A's bedroom:

 

17.    JACKSON also texted Victim A a photograph, as shown below, and wrote, "I know you with that [expletive] just call me back[.] tell w[h]at it really is with us[.] Im here until you come home[.] I'm telling you." In addition, as shown below, JACKSON texted Victim A a photograph of Victim A's personal effects and wrote, "This is the shit I know you put on w[h]en you out and it's here[.] I'm waiting? I told you I was coming."



18.    Then, as shown below, JACKSON threatened Victim A and wrote in a chain of text messages, "I'll be here w[h]en you get here"; "I'm gonna fuck you up";

Bitch, I'm going to kill you I'm telling you now"; "Bring him with u please"; "I got something for the both of yall just come home."



19.     JACKSON's text messages continued with demands to know Victim A's location. Victim A eventually responded via text and stated, among other things, "I told you to go home. And I knew you was coming that's why I left. I was in the bed laying down. You not going to tell me what you gonna do . . . Go home."

20. JACKSON texted further: "Can you talk now[?] . . . Why can't you and him face me Right now[.] I see that you got ur over night bag with you U come home." Victim A responded:

> My work bag was left in my car. And I got on my boots and coat. Who is him? Tank[,] I'm not [a]bout to be hollering with you at no 2:30 in the morning. What overnight bag[?] All my bags is in my house. I am going home now that you left.

21. JACKSON then wrote back via text, "[Victim A] you know me[.] I don't see your snowsuit I see your [boots] I don't see your post office jacket[.] bitch who do you think your [playing with] I'm here I'm outside come home." Victim A responded, "That was left in my car with my car bag on my passenger seat. Tank have a good night." JACKSON continued in response, "so your snow suit better be in your car[.] [it] is not in your house . . . tossed everything in your room in your apartment[.] ask you son[.] I am here waiting[.] Where you coming from to be exact[?]"

22. Victim A then texted, "And you in there acting out like that with my son. I advise you to go home frfr." Victim A later texted, "I left [Victim A's house] so that when you came I would be gone. Because I asked you not to come." Victim A also wrote to JACKSON, "Tank[,] go home," and that Victim A would not return to her home "as long as you [JACKSON] there." Despite Victim A's requests to JACKSON that JACKSON stop and leave Victim A's house, JACKSON continued to send a series of text messages in which JACKSON, among other things, demanded to know when Victim A would return home and wrote, "See you think you got away with the other shit[.] that's what you think but you are in for a rude awakening about that[.] where are you now[?] unblock me so we can talk." JACKSON wrote another string of text

messages to Victim A (to which Victim A did not respond), including, among other statements, "Girl[,] fuck you . . . I may be in love with you but I am not stupid[ly] in love with you"; "you're not here cause I'm here").

23.     According to JACKSON's February 17, 2018 interview with inspectors, JACKSON admitted post-*Miranda* that JACKSON called and texted Victim A the previous night and that he remained at Victim A's house until approximately 4:00 a.m., on February 17, 2018.

**JACKSON'S Unannounced February 17, 2017 Visit to Victim A's Job Site**

24.     As part of Victim A's interview with law enforcement on February 17, 2018, Victim A said that, on the morning of February 17, 2018, Victim A was at work at her Post Office at 123 Indianwood Boulevard in Park Forest, Illinois. According to Victim A, between approximately 8:10 a.m. and 8:15 a.m. (which was a few hours after Victim A had received from JACKSON the series of texts described above), Victim A was standing at her workstation. At that time and location, Victim A said that JACKSON suddenly appeared next to Victim A. Among other things, JACKSON told Victim A, "You think I'm fucking playing with you. I'm going to make your life hell." Victim A said that the postmaster subsequently arrived on the scene and told JACKSON to leave, which JACKSON eventually did. Before JACKSON left the Post Office, Victim A told officers that JACKSON asked Victim A, 'What fucking [postal delivery] route you on today?"

25.     JACKSON told Postal inspectors on February 17, 2018, that—prior to JACKSON's entry into Victim A's Post Office facility at 123 Indianwood Boulevard

in Park Forest, Illinois—JACKSON first pulled his vehicle into the dock area at the exterior of the Post Office. JACKSON said that he parked in a lane in front of a Postal delivery truck. JACKSON told inspectors that he then walked in the back doors of the Postal facility and spoke to two employees. According to JACKSON, JACKSON then looked around, saw Victim A, and went over to Victim A. JACKSON said that he told Victim A that they needed to talk. Then, in apparent reference to the postmaster, JACKSON told Postal inspectors that a "lady" came over and asked JACKSON to leave. According to JACKSON, JACKSON shook this woman's hand and told the woman that she was "cute." JACKSON told inspectors he then asked Victim A to come outside to talk, but then JACKSON left the Post Office and parked his car on the street. JACKSON told inspectors that he was "pissed" and that JACKSON had told Victim A directly at the Post Office that morning, "you gonna wish you were in hell." According to JACKSON's explanation of these events to Park Forest Police on February 17, 2018, JACKSON told Victim A at the Post Office, "After I'm done with you, your life is gonna be hell."

26.     JACKSON told Park Forest Police officers that earlier that morning of February 17, 2018, when JACKSON "entered onto the property of the post office, [JACKSON] was armed with a Rock Island Armory 1911 semi-automatic firearm which he had in a holster on his front hip." Then, according to JACKSON's February 17, 2018 written statement to Park Forest Police:

> Prior to exiting his vehicle, [JACKSON] unholstered the firearm and placed it into the front cupholder of his vehicle. This was not a locked compartment. [JACKSON] then placed a towel over the firearm in an effort to conceal it while in his vehicle. Afterwards [JACKSON] exited his vehicle and walked to the

rear loading dock, where he entered into the post office building through the rear doors.

JACKSON then located Victim A, and confronted her, as described above.

27.     According to Victim A and at least one of Victim A's Post Office colleagues, personnel at the Post Office contacted 911 in response to JACKSON's appearance on February 17, 2017. Subsequently, Park Forest Police officers arrived near the Post Office and located JACKSON seated within JACKSON's vehicle. The officers observed a firearm within a holster connected to JACKSON's hip. The officers arrested JACKSON and held him in custody at the Park Forest Police Department.

28.     While in custody at the Park Forest Police Department and following JACKSON's *Miranda* waiver, JACKSON told the officers that, after JACKSON left Victim A's Post Office the morning of February 17, 2018, JACKSON "entered his vehicle and backed down the driveway [of the postal facility lot] to Lester Road." JACKSON told officers that JACKSON "then drove to the road directly behind the post office (Leims Road), where he waited for Victim A so they may talk." According to JACKSON, "[d]uring this time [JACKSON] placed the firearm back in his holster, which was still connected to his belt on his hip" and that "[w]hile waiting [for Victim A] the officers came upon [JACKSON]."

29.     JACKSON told Postal inspectors on February 17, 2018, that his phone number is (414) 397-xx49. As discussed above, that is the same phone number from which Victim A received phone calls and text messages from JACKSON under the contact name "Tank," including on February 16 and 17, 2018.

## Conclusion

30. Based on the above information, I respectfully submit that there is probable cause to believe that from on or about February 16, 2018, through at least on or about February 17, 2018, the defendant LAWRENCE L. JACKSON, with the intent to kill, injure, harass, intimidate, used an interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate commerce, namely, cellular telephone networks and text messages, to engage in a course of conduct that placed Victim A in reasonable fear of death or serious bodily injury, or caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to Victim A.

FURTHER AFFIANT SAYETH NOT.

SASHA DOUYON
Inspector,
United States Postal Inspection Service

SUBSCRIBED AND SWORN to before me on February 20, 2018.

SHEILA FINNEGAN
United States Magistrate Judge

15